IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| In re: ) | |
| ) | Case No. 16-50261-can13 |
| **Leslie Rachelle Boston,** ) | |
| ) | |
| Debtor. ) | Chapter 13 |

## OPINION AND ORDER VALUING GAP INSURANCE AND SERVICE CONTRACT AND SUSTAINING IN PART DEBTOR'S OBJECTION TO CLAIM NUMBER 5-1

The court is asked to determine whether, in the context of a claim objection, the value of so-called GAP insurance[1] and a service contract should be considered as part of a car lender's secured claim for purposes of a Chapter 13 cramdown plan. Under these facts, the answer is yes.[2]

*Background*

Debtor Leslie Rachelle Boston owns a 2012 Kia Optima LX, which she purchased more than 910 days before she filed a Chapter 13 bankruptcy. The Optima is secured by a lien in favor of Capital One Auto Finance. On the filing date, Boston owed Capital One $17,387.50; she valued her car as worth $3,927.45. Her Chapter 13 plan proposes that she keep the car, and that she bifurcate Capital One's claim into a secured claim equal to the car's value of $3,927.45, and an unsecured claim for the balance. The plan has not yet been confirmed.

In the interim, Capital One timely filed a secured proof of claim valuing the car at $12,546. Boston objected to the claim, contesting Capital One's much higher value. In support of her proposed value of $3,927.45, Boston asserted that the Optima should be valued under the following formula: that the NADA "clean retail value" of $11,900 should be reduced by $595 (a flat 5%), minus a deduction for mileage of $2,550, minus $5,422.55 for repairs, thus equaling

---
[1] The nature of GAP insurance is discussed below.
[2] No party contests jurisdiction or that as a matter of the allowance of a claim, the matter is core. 28 U.S.C. § 1334(a); 28 U.S.C. § 157(b)(1)(B).

1

$3,927.45.[3] Capital One timely responded to the claim objection, asserting that the correct value of the Optima was $11,918.70.

At the hearing on the claim objection, Capital One's counsel said he did not have evidence to contest Boston's alleged repair costs,[4] and that Capital One otherwise did not contest the value methodology Boston had used (NADA clean retail minus 5% minus deduction for mileage minus costs of repairs). Rather, both counsel agreed that they were waiving the right to put on evidence or present other argument, and stated that they consented to the court determining as a matter of law whether the current value of a GAP insurance policy ($187.50) and a service contract ($756.80) should be added to Boston's proposed value of $3,927.45. Capital One's counsel subsequently filed documentation supplementing its proof of claim to document these values.

*Discussion*

With the exception of so-called "910 car claims,"[5] a Chapter 13 debtor may propose a plan that "crams down" the car lender's secured claim to the "value" of the car, and treats the balance of the claim as an unsecured claim. *See* 11 U.S.C. § 1325(a)(5)(B)(ii). Value of a secured claim is governed by 11 U.S.C. § 506(a)(1), which states that "[a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest … is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is

---

[3] Boston's formula is apparently based on *In re Cheatham*, Case No. 07-40509, 2007 WL 2428046, *3 (Bankr. W.D. Mo. June 19, 2007) (Federman, J.), which held that, in the absence of other evidence, the presumptive actual value of a car, or starting point, is 5% less than the NADA clean retail asking price, and that the burden is on the debtor to provide evidence of other adjustments to account for the expense needed to bring the car to "clean condition" as defined by NADA.

[4] Capital One alleged in its written response that the repairs were mostly for body damage that would suggest Boston had been in an accident, rather than normal wear and tear, and that if so, the repairs should have been covered by insurance.

[5] These are claims in which the creditor has a purchase money security interest securing the debt that is the subject of the claim and which was incurred within the 910-day period preceding the date of the filing of the petition, when the collateral consists of a motor vehicle acquired for the personal use of the debtor. 11 U.S.C. § 1325(a) (hanging paragraph). The hanging paragraph expressly states that § 506 does not apply to so-called "910 claims."

2

an unsecured claim to the extent that the value of such creditor's interest … is less than the amount of such allowed claim." Section 506(a)(1) goes on to provide that "[s]uch value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest."

For purposes of valuing a car in the context of a Chapter 13 cramdown plan in which a debtor proposes to keep the car, the Supreme Court held that the term "value" in § 506 should be "replacement value."[6] *Associates Commercial Corp. v. Rash,* 520 U.S. 953, 956 (1997) (interpreting § 506(a), now § 506(a)(1)). But Congress, in an apparent attempt to partially codify *Rash*,[7] added subsection § 506(a)(2) as part of BAPCPA in 2005.[8] Section 506(a)(2) specifically governs personal property valuations in both individual Chapter 7 and Chapter 13 cases. The first sentence of § 506(a)(2) states that such personal property be valued "based on the replacement value of such property as of the date of the filing of the petition without deduction for costs of sale or marketing." The second sentence, governing an even narrower category of personal property – that acquired for personal, family, or household purposes – defines "replacement

---

[6] **"**[B]y replacement value, we mean the price a willing buyer in the debtor's trade, business, or situation would pay a willing seller to obtain property of like age and condition." *Rash*, 520 U.S. at 959 n.2. *Rash* also noted that bankruptcy courts, as triers of fact, must determine whether the replacement value is the equivalent of retail, wholesale, or some other value based on the type of debtor and the nature of the property, and that adjustments might be necessary, where appropriate, to account for the absence of warranties, inventory, storage and reconditioning charges. *Rash*, 520 U.S. at 965 n.6.

[7] It is often stated that § 506(a)(2) codifies or partially codifies *Rash*; however, § 506(a)(2) would appear to impliedly repeal *Rash*, at least in two respects. First, *Rash* in footnote 6 permitted deductions "to account for the absence of warranties, inventory, storage and reconditioning charges," whereas § 506(a)(2) bars deductions for "costs of sale or marketing." Query whether reconditioning charges are normally part of the costs of sale? Likewise, *Rash* granted discretion to bankruptcy courts to equate replacement value with wholesale value under appropriate circumstances; § 506(a)(2)'s requirement to apply "retail merchant price" standard is inimical to use of wholesale value.

[8] "BAPCPA" is the acronym for the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. The effective date of BAPCPA, October 17, 2005, is important, since cases involving personal property valuations may or may not be relevant if they were decided prior to BAPCPA's enactment.

3

value" as "the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined."

In this case, no party disputes that Boston acquired the Optima for personal, family or household use, such that the second sentence of § 506(a)(2) governs valuation of the Optima.[9] But that is beside the point. The parties have agreed to a formula for valuing the Optima, so the court need not determine whether that formula results in a value equivalent to "the price a retail merchant would charge" for this particular Optima. Rather, the issue is how to value the GAP insurance and the service contract within the purview of § 506(a)(2). A review of *Rash* – those parts not codified or repealed by § 506(a)(2) anyway – illustrates why.

*Rash* commands that in valuing property for purposes of determining the secured status of a claim, the court must engage in a two-step process. First, the court must compare the creditor's claim to the value of "such property" – the collateral. This determination necessarily requires the court to ascertain the "creditor's interest in the estate's interest in" the property. The second step in the valuation process requires the court to determine how to value the collateral. *See Rash*, 520 U.S. at 961.

The parties in this case skipped *Rash's* first step. To determine the "creditor's interest in the estate's interest" in the property, we must review the security agreement. The Retail Installment Sale Contract reveals that Boston granted a security interest to Capital One in four different items of collateral: (1) the Optima itself; (2) any proceeds from the Optima; (3) all insurance, maintenance, service, or other contracts financed by Capital One; and (4) the proceeds of such contracts. The Contract also reveals that of the $23,652.50 purchase money loan, Boston

---

[9] The security agreement, under the category labeled "Primary Use For Which Purchased," contains a box for "personal, family or household" (as opposed to business or agricultural use), which has been checked.

financed $750 for the purchase of an "Optional Gap Contract,"[10] and $1,376 for a 72-month "service contract" through CNA National. Boston's Chapter 13 plan does not propose to reject these executory contracts. *See* 11 U.S.C. § 365(a). It follows, therefore, that these contracts are property of Boston's estate, and that Capital One has been granted an interest in them.

The second step is then to value these contracts. The only evidence of value is the documentation filed by Capital One, showing a current value[11] of $187.50 for the GAP insurance and $756.80 for the service contract (a total of $944.30). Capital One's duly executed and filed proof of claim is prima facie evidence of the validity and amount of its claim. Fed. R. Bankr. P. 3002(f). The burden then shifts to Boston as the objecting party to provide "substantial evidence" to rebut the claim. *In re Dove-Nation*, 318 B.R. 147, 152 (B.A.P. 8th Cir. 2004); *In re McDaniel*, 264 B.R. 531, 533 (B.A.P. 8th Cir. 2001). If Boston had met that burden, then the ultimate burden of persuasion would have shifted back to Capital One to show entitlement to the claim by a preponderance of the evidence. *Dove-Nation*, 318 B.R. at 152; *see also In re Thompson*, 260 B.R. 484, 487 n.10 (Bankr. W.D. Mo. 2001) (describing the burden-shifting framework); *In re Gran*, 964 F.2d 822, 827 (8th Cir. 1992) (describing the standard as preponderance of the evidence).

Here, Boston did not meet her burden of providing any evidence to show that the value of the GAP insurance and service contract was less than $944.30. Her only evidence was argument that other courts do not consider the value of these types of contracts. This court found no cases discussing how to value GAP insurance and service contracts in the context of a cramdown

---

[10] The parties use the term "gap insurance," but did not provide a copy of the "Optional Gap Contract." For a brief description of gap insurance, see *In re Miller*, Case No. 08-40935, 2008 WL 5539811, *3 (Bankr. D. Kan. Dec. 2, 2008) ("GAP coverage is intended to retire any deficiency that might exist if a borrower damages his vehicle, and his liability insurance coverage is insufficient to cover the amount remaining due on the note . . . . In other words, if the vehicle is destroyed, the GAP coverage eliminates the debt so the borrower is not personally liable for the remaining note balance.").

[11] Neither party addressed the appropriate date for the valuation nor is there other evidence of the value of the contracts as of the date of the filing. The court therefore accepts the values as of the date of the hearing.

Chapter 13 plan under §§ 506 and 1325(a)(5)(B)(ii). The cases Boston refers to involve whether the financing of these additional items along with a car defeats the purchase-money security-interest nature of a 910 car claim; under the hanging paragraph, § 506 does not apply to such claims. *See, e.g., In re Padgett*, 408 B.R. 374 (B.A.P. 10th Cir. 2009); *In re Munzberg*, 388 B.R. 529 (Bankr. D. Vt. 2008); *In re Miller*, Case No. 08-40935, 2008 WL 5539811 (Bankr. D. Kan. Dec. 2, 2008); *In re Macon*, 376 B.R. 778 (Bankr. D.S.C. 2007). These cases thus do not apply to GAP insurance and service contracts when the issue is their value under § 506(a)(2).

*Conclusion*

There being no other evidence in the record regarding the value of the GAP insurance and service contracts, the Court finds that the value of the GAP insurance is $187.50 and the value of the service contract is $756.80. Capital One's Claim No. 5 filed in the amount of $17,387.50 is therefore allowed as secured in the amount of $3,927.45 plus $187.50 plus $756.80, or a total of $4,871.75, and unsecured in the amount of $12,515.75.

IT IS SO ORDERED.

Dated:  December 2, 2016                        /s/ Cynthia A. Norton
                                                United States Chief Bankruptcy Judge

\*\*Movant to serve interested parties not receiving electronic notification